## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **MARC L. MERRILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:19-cv-00391-JDL** |
| | ) | |
| **STATE OF MAINE, a/k/a STATE** | ) | |
| **POLICE OF THE STATE** | ) | |
| **OF MAINE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON MOTION TO DISMISS

Marc L. Merrill brings this case arising out of an allegedly flawed 2013 child pornography investigation and prosecution in Maine state court.  Merrill, who is proceeding pro se, has filed a Complaint with this Court against the Maine State Police (MSP); the Maine State Police Computer Crimes Unit (MCCU); and six MSP and MCCU officers and employees acting in their individual and official capacities: Robert Williams, Jason Bosco, David Armstrong, Glenn Lang, Jessica Langford,[1] and John Moran (collectively, the "Individual Defendants"), asserting claims under 42 U.S.C.A. § 1983 (West 2020), as well as Maine tort law (ECF No. 1).  The Defendants move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all of Merrill's claims (ECF No. 25).  For the reasons that follow, I grant the motion.

---

[1] Merrill's complaint names Langford under her former name, Jessica Miller.  I refer to her using the name "Jessica Langford."

# I.  LEGAL STANDARD

## A.  Rule 12(b)(1)

When a defendant moves to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of demonstrating that the court has jurisdiction.  *Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996).  The moving party may use "affidavits and other matter to support the motion," while the plaintiff may establish the existence of subject-matter jurisdiction through materials outside the pleadings.  5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed., Oct. 2020 Update); *see also Aversa*, 99 F.3d at 1210; *Hawes v. Club Ecuestre el Comandante*, 598 F.2d 698, 699 (1st Cir. 1979) (question of jurisdiction decided on basis of answers to interrogatories, deposition statements, and an affidavit).

In this case, the Defendants have appended a document to their motion, the Affidavit of Amy J. Oliver (ECF No. 25-2), in support of the proposition that this Court lacks jurisdiction over Merrill's state-law tort claims.  I have taken that document into account for that purpose.

## B.  Rule 12(b)(6)

The U.S. Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level . . . .

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and internal punctuation omitted).  This standard requires the pleading of "only enough facts to

state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Determining the plausibility of a claim "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016) (citation and internal quotation marks omitted). While "the plaintiff bears the burden of plausibly alleging a viable cause of action," *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016), the defendant bears the burden of demonstrating that a complaint does not state a legally cognizable claim for which relief can be granted, *see* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed., Oct. 2020 Update).

In ruling on a motion to dismiss under Rule 12(b)(6), a court assumes the truth of all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Román-Oliveras v. P.R. Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011). The First Circuit has instructed that a court addressing a Rule 12(b)(6) motion "should begin by identifying and disregarding statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citation and internal punctuation omitted). "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible." *Id*. "If that factual content, so taken, allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility." *Id.* (citation and internal quotation marks omitted).

Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to [the plaintiff's] claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

In this case, the Defendants have submitted three documents that are central to Merrill's claim and sufficiently referred to in the complaint to warrant consideration in the Rule 12(b)(6) context: (1) a redacted Affidavit and Request for Search Warrant, which incorporates an Affidavit by Defendant Bosco (ECF No. 25-1); (2) an Order on Defendant's Third Motion to Suppress, *State v. Merrill*, Docket No. CR-2013-234 (Me. Super. Ct. May 23, 2015), which is docketed in this case at ECF No. 25-3; and (3) an Order on Defendant's Motion to Dismiss for Speedy Trial Violations, *State v. Merrill*, Docket No. CR-2013-234 (Me. Super. Ct. Apr. 19, 2018), docketed at ECF No. 25-4. I have taken these documents into account as well.

Although a pro se plaintiff's complaint is subject to "less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner,* 404 U.S. 519, 520 (1972), the complaint may not consist entirely of "conclusory allegations that merely parrot

the relevant legal standard," *Young v. Wells Fargo Bank, N.A.,* 717 F.3d 224, 231 (1st Cir. 2013); *see also Ferranti v. Moran,* 618 F.2d 888, 890 (1st Cir. 1980) (explaining that the liberal standard applied to the pleadings of pro se plaintiffs "is not to say that *pro se* plaintiffs are not required to plead basic facts sufficient to state a claim").

## II. BACKGROUND

Merrill brings a claim against all of the Defendants pursuant to 42 U.S.C.A. § 1983 for violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution (Count One); a claim against the MSP, the MCCU, Williams, and Lang under § 1983 for failure to adequately hire, staff, and supervise computer crimes staff (Count Two) and for failure to adequately train computer crimes staff (Count Three); a claim against all of the Defendants for false arrest and malicious prosecution under Maine law (Count Four); a claim against all of the Defendants for defamation (Count Five); a claim against all of the Defendants for intentional infliction of emotional distress (IIED) (Count Six); and a claim against all of the Defendants for negligent infliction of emotional distress (NIED) (Count Seven).[2]  The Complaint sets forth the following relevant factual allegations.[3]

## A.    The Defendants

The MSP is a political subdivision of the State of Maine and the chief law enforcement agency of the State of Maine. The MCCU is a department within the

---

[2]  The complaint also invokes the Maine Constitution; however, Merrill does not contest the Defendants' characterization of Counts One through Three as § 1983 claims and Counts Four through Seven as common-law tort claims, and I do not address any Maine constitutional claims.

[3]  Merrill has included legal arguments in many of the paragraphs in his recitation of the alleged facts.  ECF No. 1 ¶¶ 17, 20-21, 27-28, 35-36, 40, 47, 49, 55, 62, 64-69, 77, 88-89.  I have omitted those legal arguments from this recitation and addressed them, where appropriate, in my discussion below.

MSP that is responsible for the investigation of all state child pornography allegations within the State of Maine. Bosco is a law enforcement officer who was employed by the MSP or the MCCU at all relevant times and was the primary investigator in the criminal investigation involving Merrill. Armstrong, Langford, and Moran are law enforcement officers who were employed by the MSP and/or the MCCU at all relevant times. Lang is a law enforcement officer who was employed by the MSP or the MCCU at all relevant times and was the law enforcement officer in charge of Bosco, Armstrong, and the MCCU. At all relevant times, Williams was the Chief of the MSP and as such was responsible for the training, supervision, and discipline of subordinate officers as well as the implementation of MSP and MCCU practices. Williams, Lang, the MSP, and the MCCU were responsible for the training, supervision, and hiring of employees such as Bosco, Armstrong, Langford, and Moran and the customs, policies, and practices of the MCCU and its employees during the relevant period.

The MCCU relies on federal funding from the Department of Justice (DOJ) under the Internet Crimes Against Children (ICAC) Task Force designation. The requirements for a state ICAC Task Force to receive federal grant money are detailed in a memorandum of understanding between the Office of Juvenile Justice and Delinquency Prevention and the Attorney General of the United States. The ICAC Task Force must strictly adhere to training and operational standards, with acknowledgement of liability if those standards are not met. The more arrests an ICAC Task Force makes, the more federal funding it receives.

The MCCU uses a database clearing house (Data Base One, or DB1) that collects and collates Internet Protocol (IP) addresses from a specialized law enforcement program called RoundUp eMule ("RoundUp"). RoundUp is re-engineered software from a popular freeware peer-to-peer file sharing program called eMule or eDonkey. RoundUp was developed by entities and individuals including the University of Massachusetts Department of Computer Science, the Georgetown University Department of Computer Science, and former Pennsylvania State Police Computer Crimes supervisor Robert Erdely, among others. It is used by law enforcement to surveil and record potential IP address targets, along with their geographic locations, who may be intentionally downloading child pornography files. This data is then used to apply for search warrants.

## B.  Investigation of Merrill and Search Warrant Application

Merrill, his wife, and their two children moved to Rockland, Maine, in May 2013 after he secured employment in Camden. The family purchased land in Rockport on which they planned to build a home, and rented a home in Rockland while the new home was being built.

On August 27, 2013, Defendant Bosco applied for a search warrant with the state court for Merrill's home, supported by an affidavit. In his affidavit, Bosco stated that the MCCU had opened a peer-to-peer child pornography investigation when forensic analyst Langford, while signed onto the DB1 website, observed IP address 74.78.186.209 as a potential target. He stated that the "IP address was seen by law enforcement sharing files of interest on June 24, 2013 at [4:02 a.m.]" and, "[a]t this

time[,] there were approximately 11 different files in the shared file folder with titles indicative of child pornography." ECF No. 25-1 at 2.

Bosco stated that DB1 monitors activity on peer-to-peer networks, which are "designed to facilitate the sharing of electronic files between participating members over the Internet." *Id*. He added, "[t]o become a member of a peer-to-peer network, a user installs a computer program that creates a 'sharing folder' on their computer, into which they insert any electronic files that they wish to make available for other members of the network to copy," and that the user, "in turn, gain[s] the ability to copy any electronic files that the other network members have made available on their computers." *Id*. Bosco stated that law enforcement agents had discovered that, "by joining a peer-to-peer file sharing network and submitting a request for an electronic file known to contain child pornography, as verified by the file's hash value,[4] they can readily identify the IP addresses of other network members who have attempted to disseminate that particular piece of child pornography by making it available to be copied." *Id*. at 2-3. He added that the DB1 database "stores the IP addresses that have been identified as offering electronic files known to contain child pornography" and "identifies the general geographic area of the subscriber to whom each IP address was assigned." *Id*. at 3.

---

[4] Bosco defined a "hash value" as "a very long series of numbers and letters . . . that is calculated by applying a standard mathematical algorithm to the electronic data that is contained in an electronic file[,]" explaining that "[o]nly identical electronic files will have the same hash value." ECF No. 25-1 at 2.

Bosco added that the information from DB1 identified the internet service provider (ISP) as Time Warner Cable (TWC).  He stated that an assistant attorney general had subpoenaed TWC requesting subscriber information associated with IP address 74.78.186.209 at 4:02 a.m. on June 24, 2013, and had received a response showing that this IP address was assigned to Merrill.[5]

Bosco stated that on August 19, 2013, he conducted research on IP address 74.78.186.209 using DB1, and that this IP address "was observed by law enforcement sharing approximately 55 files of interest using a peer to peer file[] sharing program called EMule."  ECF No. 25-1 at 3.  He stated that, using an Excel spreadsheet, he determined that there were "11 unique sha1's" in the IP address history.[6]  *Id.*  Bosco searched DB1, which contains a list of sha1's known to law enforcement as child pornography files, and attached one of these sha1's to his affidavit, describing it as a still image from a child pornography video.

Bosco stated that based on his education, training, and experience, there was probable cause to believe that a computer located in Merrill's residence had been used to possess and disseminate child pornography and that the residence contained computers, related equipment, and other evidence used in the commission of those crimes.

---

[5] Merrill alleges that TWC's subpoena response "was not clear as to what the subscriber record indicated," and that "[n]o network data logs were provided to confirm that at [4:02 a.m.] on June 24th, the IP address belonged to" him.  ECF No. 1 ¶ 30.  However, Merrill does not actually allege that the IP address was not assigned to his TWC account at that time, and indeed, that connection is implied by several other statements in his complaint, as I discuss below.

[6] Neither Bosco's affidavit nor the parties' filings in this case define the term "sha1," but from the parties' usages of the term in context, it appears to be a particular type of hash value.

Based on Bosco's affidavit, a Maine District Court Judge issued a warrant to search Merrill's residence, motor vehicles, and any persons located in the residence at the time of the search for "[e]vidence of the crimes of dissemination of sexually explicit material in violation of 17-A M.R.S.A. § 283 and possession of sexually explicit material in violation of 17-A M.R.S.A. § 284," including images of child pornography "in any form" and "[c]omputers and digital storage media of any kind."  ECF No. 25-1 at 1-2.

## C.    Merrill's Allegations of Errors in the Bosco Affidavit

In his complaint, Merrill alleges that an IP address alone does not identify a person and in some cases is insufficient to identify the location of suspected illegal activity, and that "[t]here was never any evidence presented that the IP address 74.78.186.209 was downloading or attempting to access illegal files at 4:02 a.m. on June 24, 2013."  ECF No. 1 ¶¶ 28, 32.  An expert named Benjamin Birney[7] analyzed the DB1 spreadsheet created by the Defendants and concluded that the investigative actions taken on June 24, 2013, were unsuccessful attempts to verify the existence of certain files on a computer.   ISP subscribers typically are assigned dynamic IP addresses, meaning that IP address assignments are random and reused by ISP computers as needed to support the network.  Therefore, they can change at any time.  At the time, TWC's policy documentation confirmed the use of dynamic IP address assignments as the default service for internet subscribers.  Subscriber records do not

---

[7] Merrill's complaint does not fully identify Birney—from context, I presume that he is a forensic computer analyst that Merrill hired—or describe the source or nature of his analysis.  For purposes of resolving the Defendants' motion to dismiss, I treat Merrill's factual allegations as true no matter their evidentiary source.

identify a specific person involved in illegal internet activity.  They simply show the street address where the service is being provided and the name of the person who is paying the bill for the internet services.

With respect to Bosco's statement that there were 55 files of interest in a shared folder, Merrill alleges that at no time was there any evidence presented regarding the existence of 55 files in a shared folder, nor were such files found after seizure and forensic review.  With respect to Bosco's statement that at 4:02 a.m. on June 24, 2013, there were 11 different files in a shared file folder with titles indicative of child pornography, Birney concluded that "it was not accurate to state that even one file, much less 11, was being shared at IP address 74.78.186.209 on that date." ECF No. 1 ¶¶ 38-39.  "The file log did not contain the names of any files allegedly being shared at IP address 74.78.186.209."  ECF No. 1 ¶ 39.

In a digital environment, a file of any type of content can have any title or file name; therefore, a user cannot know the actual contents of a file based only on the file name.  Additionally, the eMule client does not download files in a sequential stream of data from beginning to end; rather, it downloads files in chunks that are then randomly assembled based on the availability of chunks from other users.  It is very unlikely that a user would know the content of a file in this partially constructed state.  Partial or incomplete downloads generally cannot be viewed or disseminated and, therefore, a user typically does not know what the content of the file is until it is completely downloaded.

Every file in the investigation of Merrill was documented by law enforcement's own DB1 logs as either 0% downloaded or partially downloaded.  There weren't any files that were found to be 100 percent downloaded in any shared folder on Merrill's computer.  According to Birney's analysis and report, the mere presence of a hash value associated with an IP address in RoundUp "does not lead to a reliable conclusion, or even a strong probability, that a computer [associated with the] IP address actually possesses the contraband identified by the hash value."  ECF No. 1 ¶ 43.

The child pornography file that Bosco attached to his search warrant affidavit was never found in subsequent state forensic reviews of the computer that was eventually found to have eMule installed.  Birney alleges that Bosco did not obtain the attachment from the computer at IP address 74.78.186.209 and that it could not be verified to exist in any complete or viewable form at that IP address.  According to Birney, Bosco used the sha1 value from a spreadsheet and then used the National Center for Missing and Exploited Children (NCMEC) database to determine the imagery associated with that file.  Birney stated that law enforcement has the capability through the tools in RoundUp to confirm that a particular file is in possession of a target computer, but that they did not do so or were unable to do so in this case.  He concluded that, "without file verification, the RoundUp tool used in this way is not a reliable indicator that a computer at the IP address possesses the contraband indicated by the hash value in any usable form."  ECF No. 1 ¶ 51.

**D.      Search and Arrest**

On the morning of August 28, 2013, Merrill's wife had just returned home after dropping off their six-year-old daughter at school when Defendants Bosco and Armstrong knocked on the door, identifying themselves as policemen.  Merrill was in the bathroom wearing fleece pajamas, and his three-year-old son was playing in the living room.  Merrill's wife invited the policemen inside and went to get Merrill, who came out to speak with them.   Bosco and Armstrong indicated that they were investigating a crime and hoped that Merrill could help them.  Merrill asked, "Do I need to talk to an attorney about something?"  ECF No. 1 ¶ 56.  Bosco responded, "That's a choice that you have to make[.]  I can't make any of those decisions for you." *Id*.  The police officers restricted Merrill's movements and separated him from his wife and son.  Merrill alleges that when he was separated from his wife, the pressure on him to give statements was amplified.  The following exchange occurred:

> Bosco:  And I think it makes your life a lot easier in the long run.  Umm.
> Merrill:  And you want?
> Bosco:  We are here to tell you, we're not just going to go away without finding our answers.  So, it's, I think it behooves you to help us.
> Merrill:  Yeah.
> Bosco:  And to try to figure out why this is happening.

*Id*. ¶ 57.  Bosco continued to reiterate, "We're not going away with no answers." *Id*.

¶ 58.  During the questioning, Merrill and Bosco had the following exchange:

> Merrill:  Can I get some clothes on?
> Bosco:  Yeah, sure.  I gotta go with you if you're goin'.
> Merrill:  Oh.
> Bosco:  Anywhere you go, I'm comin' with you.

*Id*. ¶ 59.  Bosco and Armstrong repeatedly told Merrill that they would tear his house apart if he did not give them the information they wanted; for instance, Armstrong stated:

> I'm going to say this, I can tear this house apart, ok?  I don't want to do that, ok?  I'm personally losing my patience alright so if you want me to do that to try to find it, because no one says it's probably at my office. It's either at your office or somewhere within this premise, be it car, whatever.  So just give it to me so I don't have to go tear everything.

*Id*. ¶ 60.  An additional officer was called in to guard Merrill while the search and seizure was taking place.

The police seized a total of thirteen items, including computers, laptops, storage devices/drives, digital cameras, smart phones, and cell phones.  After forensic review, twelve of those items were found to contain nothing of evidentiary value.

The interrogation and search lasted between two and a half and three hours, after which Merrill was handcuffed and forced to sit on his front porch.  Bosco drove Merrill to the Knox County Jail for processing, during which time he continued to question him even after his *Miranda* rights were read.[8]  Although no warrant had been issued for the arrest, Bosco decided to arrest him, which according to the complaint was "for reasons that are not understood."  ECF No. 1 ¶ 72.  Bosco admitted during cross-examination in a subsequent hearing that the police typically do not arrest suspects in these types of cases when there is no confession.

---

[8] According to Merrill, "Bosco had two prior *Miranda* violations attributed to him in other cases." ECF No. 1 ¶ 76.

E.      **Forensic Analysis and Prosecution**

In a forensic report dated April 25, 2013, Defendant Langford, a forensic analyst, noted that she located "approximately 160 files in allocated space" in a directory folder called "New Folder 2" on the computer allegedly associated with contraband.  ECF No. 1 ¶ 87.  However, she did not note that New Folder 2 was set to "hidden" or that there was no evidence that the files were ever accessed or viewed.

In a report dated May 22, 2014, Defendant Moran, another forensic analyst, stated with respect to the same computer, "Malware scans were performed on the evidence in this case; no evidence of malware that would have allowed unauthorized remote access was found."  *Id.* ¶¶ 84-85.  According to Merrill, Moran's "own scans did find trojans," and Birney's examination of the computer turned up "numerous malware, viruses, and a RAT (Remote Access Trojan)."  *Id.* ¶¶ 85-86.  RATs allow unauthorized remote access.

Merrill was indicted in December 2013 for possession of child pornography in violation of 17-A M.R.S.A. § 284 (West 2020) and arraigned in February 2014. Despite multiple requests that Knox County Assistant District Attorney Christopher Fernald provide Merrill with state forensic reports, no reports were produced until June 2014.  Merrill moved to suppress the statements that he made after Armstrong threatened to "tear this house apart" on *Miranda* grounds, and sought discovery related to the software tools used by law enforcement to produce the information on

which the warrant application was based, including the DB1 website.  Merrill also moved for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978).[9]

Merrill's motion to suppress, as well as his request for a *Franks* hearing, were denied based largely on the affidavit and testimony of Defendant Lang.  Lang submitted an affidavit stating that the MCCU "does not utilize or enable fake file sharing as part of the [RoundUp] program and it was not done during this investigation."  ECF No. 1 ¶ 98.  Lang repeated this assertion at the hearing on the motion to suppress.  ECF No. 1 ¶ 99.  Regarding this statement, Birney concluded:

> We cannot agree with [this sentence].  The eMule History spreadsheet, which apparently documents the investigation of IP address 74.78.186.209, contains Log Type 5 entries.  These entries are recorded "[i]f actual sharing or fakeshare is enabled and we get a request for part of a file."  ICACCops.com webpage.  This is contrary to . . . Lang's assertion . . . .

*Id.* ¶ 98.  Lang's affidavit also stated:

> P2P software is open source and is free of charge.  This allowed Law Enforcement officers to create unique versions of a number of common P2P clients.  These versions allowed for the automated logging of the officer's observation.  In some cases, an officer can start the search for contraband and the software continues to run until stopped by the officer.  All of the observations are of publicly available files.

*Id.* According to Birney, Lang's final sentence was false or misleading: "[T]here is a very high likelihood that the files 'observed' through the use of RoundUp eMule are not 'publicly available files' because they have not been completely downloaded to be

---

[9]  A *Franks* hearing is required if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *United States v. D'Andrea,* 648 F.3d 1, 12-13 (1st Cir. 2011) (citation and internal quotation marks omitted).

made available for sharing," and no files associated with Merrill's IP address had been more than 50% downloaded.  *Id*.

Following an evidentiary hearing on Merrill's motion to suppress, Maine Superior Court Justice Daniel I. Billings suppressed certain statements that Merrill made after his arrest on *Miranda* grounds.  Regarding the search warrant's validity, Justice Billings determined that (1) the search warrant "had particularity," was not overbroad, and was based on probable cause; (2) "the minor issues with the drafting of the affidavit did not make the contents misleading so as to undermine the validity of the issuance of the warrant"; (3) "the search conducted was within the scope of the warrant and the manner in which it was conducted was reasonable"; and (4) "[t]he affidavit supporting the warrant established sufficient probable cause that a crime had been committed at the location to be searched."  ECF No. 25-3 at 1-2.

On April 19, 2018, Justice Billings dismissed the case against Merrill on speedy trial grounds, concluding that the lengthy delay in the case was attributable to the prosecution and that further delay would prejudice Merrill's defense, particularly the ability of Birney to testify.

The complaint asserts that the arrest and prosecution "had profound consequences to [Merrill's] employment, reputation, liberty, parental rights, and financial status."[10]  ECF No. 1 ¶ 74.  "He lost his job, work computer, and smart phone

---

[10]  After Merrill was released on bail following his arrest, Bosco requested that the Maine Department of Health and Human Services (DHHS) open a case against him.  Merrill hired an attorney to represent him in the DHHS case, and after an investigation, DHHS concluded that there was no threat to the children and dropped the case.

from which he conducted his real estate business." *Id.* "He lost credibility in the local community, . . . lost the right to be with his children without supervision for nearly 5 years," and had to hire and pay "an attorney to defend himself [against] felony charges." *Id.*

### III.  DISCUSSION

### A.    Constitutional Claims

Construed liberally, Merrill's complaint alleges that Bosco, Armstrong, Langford, Moran, and Lang, in their personal capacities, violated his Fourth, Fifth, Eighth, and Fourteenth Amendment rights, and seeks damages under 42 U.S.C.A. § 1983.[11]  The Defendants argue that no constitutional violation occurred and that, in any event, they are entitled to qualified immunity for any violation, warranting the dismissal of these claims.  I agree.

The First Circuit has explained that when a defendant invokes qualified immunity, a court must undertake a two-step analysis:

> First, the court must determine whether the plaintiff's version of the facts makes out a violation of a protected right.  Second, the court must determine whether the right was clearly established at the time of [the] defendant's alleged misconduct.  The second step itself has two sub-parts.  Sub-part one requires the plaintiff to identify either controlling authority or a consensus of cases of pervasive authority sufficient to signal to a reasonable official that particular conduct would violate a constitutional right.  Sub-part two requires us to consider whether a reasonable official in the defendant's position would have known that his conduct violated the established rule.  These inquiries are carried out with the understanding that qualified immunity is

---

[11] Because "[n]o cause of action for damages is stated under 42 U.S.C. § 1983 against a state, its agency, or its officials acting in an official capacity," *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 124 (1st Cir. 2003), I dismiss Merrill's § 1983 claims against the MSP, the MCCU, and the six Individual Defendants in their official capacities.

meant to shield all but the plainly incompetent or those who knowingly violate the law.

*Norton v. Rodrigues*, 955 F.3d 176, 184 (1st Cir. 2020) (citations, alterations, and internal quotation marks omitted).  "Taken together, these steps normally require that, to defeat a police officer's qualified immunity defense, a plaintiff must identify a case where an officer acting under similar circumstances was held to have violated the [Constitution]."  *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (per curiam)).  "Although such a case need not arise on identical facts, it must be sufficiently analogous to make pellucid to an objectively reasonable officer the unlawfulness of his actions."  *Id.* (footnote and citations omitted); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).  Additionally, "[a] circuit split does not foreclose a holding that the law was clearly established, as long as the defendants could not reasonably believe that [the controlling Circuit] would follow the minority approach."  *Irish v. Fowler*, --- F.3d ---, 2020 WL 6504296, at *10 (1st Cir. Nov. 5, 2020).

 "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *Guzmán-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

## 1.    **Fourth Amendment Claims**

Merrill's complaint is fairly characterized as asserting five distinct Fourth Amendment violations: (1) the search warrant was unsupported by probable cause, (2) the warrant was overbroad, (3) the search was carried out in an unconstitutional

manner, (4) he was arrested without probable cause, and (5) he was subjected to malicious prosecution.

### a.   Probable Cause for Search Warrant

Probable cause to issue a search warrant exists when, "given all the circumstances set forth in the affidavit[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Reiner*, 500 F.3d 10, 15 (1st Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (alteration omitted)). As the Defendants point out, this Court does not write on a blank slate in determining whether the Bosco affidavit established probable cause to search Merrill's home for the enumerated items: not only did the judge issuing the warrant find it sufficient, but Justice Billings—viewing the warrant application in the clearer light of the adversarial process—agreed.

However, "an officer who obtain[s] a warrant through material false statements which resulted in an unconstitutional search may be held personally liable for his actions under § 1983." *Jordan v. Town of Waldoboro*, 943 F.3d 532, 540 (1st Cir. 2019) (alterations and quotation marks omitted). "[A] search warrant must be voided if (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) the affidavit's remaining content is insufficient to establish probable cause." *Id.* at 540 (quoting *Franks*, 438 U.S. at 155-56).

Merrill argues that "Bosco purposely misrepresented" the results of the DB1 search and TWC's "ambiguous subpoena response," asserting that Birney "proved

DB1 logs themselves do not confirm content of files or that there was even one file possessed by the target IP address" and that "the IP address was never confirmed to belong to a subscriber account at Plaintiff's home."  ECF No. 30 at 13.  Merrill also represents that Justice Billings denied his request for a *Franks* hearing.  Justice Billings's decision on that request is not in the record, and it is not clear whether he considered the same arguments that Merrill advances here.  However, even if he did not, I independently conclude that the complained-of misrepresentations and omissions did not undermine probable cause for the search, for the following reasons.

Merrill does not dispute that (1) a DB1 search on June 24, 2013, identified IP address 74.78.186.209 as a potential child pornography target; (2) TWC was the ISP associated with that IP address; and (3) in response to a subpoena, TWC identified that IP address as assigned to him.  While Merrill alleges that "[t]he reply back from TWC was not clear as to what the subscriber record indicated," ECF No. 1 ¶ 30, he does not explain this apparent lack of clarity.  His allegation that "[n]o network data logs were provided to confirm that at 4:02AM on June 24th, the IP address belonged to subscriber Marc Merrill," *id.*, does not undermine Bosco's representation in his affidavit that TWC identified the IP address at issue as assigned to Merrill.  Indeed, the complaint elsewhere alleges that such subscriber records "merely show the street address of where the service is being provided, and the name of the person who is paying the bill."  *Id.* ¶ 35.

Moreover, as the Defendants correctly observe, the presence on Merrill's computer of at least partially downloaded files with hash values associated with child

pornography is implied by several allegations in Merrill's Complaint. Merrill alleges, for example, that (1) "[t]here was never any evidence presented that IP Address 74.78.186.209 was *downloading or attempting to access illegal files* at 4:02AM EST on June 24th, 2013," ECF No. 1 ¶ 32 (emphasis added); (2) Birney "concluded that the mere presence of a hash value associated with an IP address in RoundUp does not lead to a reliable conclusion, or even a strong probability, that a computer at the IP address actually possesses the contraband identified by the hash value," *id*. ¶ 43; (3) "every file in this case was documented by law enforcement's own DB1 logs as either 0% downloaded or partially downloaded," *id*. ¶ 44; and (4) "[t]here was not one file in this case that was 100% downloaded in a shared folder," *id*. In short, even taking Merrill's allegations as true, Bosco's affidavit established a connection between an IP address associated with Merrill, and the partial download of files with hash values associated with child pornography. The fact that the files would not necessarily have been viewable, nor their contents known to the end user, in this partial state did not negate that connection or undermine probable cause.

Merrill notes that, in *United States v. Falso*, 544 F.3d 110 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that a warrant to search a defendant's home for evidence of child pornography was unsupported by probable cause when it alleged only that it "'appear[ed]'" that the defendant had "'gained access or attempted to gain access'" to a child pornography website. ECF No. 1 ¶ 27 (quoting *Falso*, 544 F.3d at 121 (emphasis omitted)). *Falso* is distinguishable in that the affidavit submitted in support of the requested warrant to search and seize evidence

of child pornography from the defendant's home lacked any allegations (1) that the defendant had "gained access" to the specific child pornography website at issue, "much less that he was a member or subscriber of any child-pornography site," or (2) that would "support an inference that the sole or principal purpose of the [web site at issue] was the viewing and sharing of child pornography, much less that images of child pornography were downloadable from the site." *Falso*, 544 F.3d at 124.  The court noted that "the absence of membership" in a child-pornography website "would not be dispositive if other factors—such as evidence that the defendant otherwise downloaded illegal images—were present." *Id.* at 120.  The undisputed facts contained in Bosco's affidavit here, by contrast, were sufficient to support an inference that partially downloaded files with hash values associated with child pornography were present, at least to the probable cause standard.

Merrill also points to an amicus brief filed in *United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019), in which the Electronic Frontier Foundation urged the Fourth Circuit to adopt the Second Circuit's approach, arguing that evidence that an IP address accesses or attempts to access a randomized URL from a file-sharing website that allegedly contains contraband is insufficient to establish probable cause to search a suspect's home or electronic devices.  But the Fourth Circuit expressly rejected that proposition, stating that "a reasonable inference that someone using [the defendant's] IP address clicked [a] link knowing that it contained child pornography" made it "fairly probable that criminal evidence would have been found at [the defendant's] address." *Bosyk*, 933 F.3d at 325.  The same is true here.

As the Defendants argue, even if these facts ultimately were insufficient to support a conviction, and even if Bosco's affidavit had accurately and fully described the incompleteness and nature of the files that he had observed as having been partially downloaded at Merrill's home, the uncontested facts in Bosco's affidavit were sufficient to establish a *fair probability* that contraband—namely, evidence of the crimes of dissemination of sexually explicit material in violation of 17-A M.R.S.A. § 283 or possession of sexually explicit material in violation of 17-A M.R.S.A. § 284— would be found in Merrill's home.[12]

Accordingly, Merrill fails to state a claim that Bosco's alleged misrepresentations and omissions undermined probable cause for the issuance of the warrant to search his home.

### b. Overbreadth of Search Warrant

To the extent that Merrill argues that the scope of the warrant was overbroad, Justice Billings found otherwise, and I agree.  Merrill notes that "[w]hen a warrant

---

[12] "A person is guilty of dissemination of sexually explicit material," a Class C crime, "if . . . the person intentionally or knowingly disseminates or possesses with intent to disseminate any book, magazine, newspaper, print, negative, slide, motion picture, videotape, computer data file or other mechanically, electronically or chemically reproduced visual image or material that depicts any person who has not in fact attained 16 years of age who the person knows or has reason to know is a person under 16 years of age engaging in sexually explicit conduct, except that it is not a violation of this paragraph if the person depicted is 14 or 15 years of age and the person is less than 5 years older than the person depicted."  17-A M.R.S.A. § 283(1)(A) (West 2020).  "A person is guilty of possession of sexually explicit material," a Class D crime, "if that person . . . [i]ntentionally or knowingly transports, exhibits, purchases, possesses or accesses with intent to view any book, magazine, newspaper, print, negative, slide, motion picture, computer data file, videotape or other mechanically, electronically or chemically reproduced visual image or material that the person knows or should know depicts another person engaging in sexually explicit conduct, and . . . [t]he other person has not in fact attained 16 years of age; or . . . [t]he person knows or has reason to know that the other person has not attained 16 years of age," unless "the person depicted is 14 or 15 years of age and the person is less than 5 years older than the person depicted."  *Id*. § 284(1)(A).

fails 'to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held [. . .] to be unconstitutional.'" ECF No. 1 ¶ 68 (quoting *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995)). Merrill complains that, in this case, the search warrant used the language "in any form" and "of any kind" in detailing the items to be seized. However, the search warrant authorized the seizure only of images, records, and evidence "in any form" pertaining to child pornography, computers, digital storage media, camera equipment, and storage media "of any kind," and records "in any form" evidencing occupancy or ownership of the premises to be searched or ownership or use of the computer equipment and other evidence to be seized. ECF No. 25-1 at 1-2. The search warrant was sufficiently tailored to the circumstances.

In the alternative, the Defendants are entitled to qualified immunity. Merrill identifies no controlling Supreme Court or First Circuit authority for the proposition that the language at issue is overbroad, instead relying on inapposite cases from other jurisdictions. *See United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017)); *Millender v. County of Los Angeles*, 620 F.3d 1016 (9th Cir. 2010), *rev'd sub nom. Messerschmidt v. Millender*, 565 U.S. 535 (2012); *United States v. Hunter*, 13 F. Supp. 2d 574 (D. Vt. 1998). These cases do not represent "a consensus of cases of pervasive authority sufficient to signal to a reasonable" officer in Bosco's or Armstrong's shoes that his conduct "would violate a constitutional right." *Rodrigues*, 955 F.3d at 184. Indeed, *Millender* was reversed by the Supreme Court, which concluded that the officers were

entitled to qualified immunity, *see Messerschmidt*, 565 U.S. at 539, 556, and *Hunter* and *Griffith* are distinguishable.[13]

### c.    Reasonableness of Search Warrant's Execution

Merrill next challenges the manner in which the warrant was executed, arguing that Bosco and Armstrong engaged in "a concerted and deliberate effort to get [him] to confess to a crime."  ECF No. 1 ¶ 55.  He alleges, for example, that Bosco told him that the police would not go away without answers; that Bosco and Armstrong, with the aid of a third officer who was called in, restricted his movements and separated him from his family; and that their tone was sometimes aggressive, for example, threatening to tear the house apart if he did not disclose the location of a laptop.

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *United States v. McCarty*, 475 F.3d 39, 43 (1st Cir. 2007) (quoting U.S. Const. amend. IV).  "Even a search conducted pursuant to a warrant may be 'unreasonable' given the manner in which the search has been conducted."  *Id*.  The Fourth Amendment's "general touchstone of reasonableness" guides an assessment of whether the "method of execution of the warrant" is constitutional.  *United States v. Ramirez*, 523 U.S. 65, 71 (1998).  In assessing reasonableness, the court "must assess the totality of the circumstances, including 'the scope of the particular intrusion, the manner in which

---

[13] In *Hunter*, the breadth of the warrant was problematic because it involved a search of an attorney's records, which contained confidential and privileged material.  13 F. Supp. 2d at 578, 584.  *Griffith* concerned a warrant to seize all cell phones and other electronic devices in the context of alleged possession of a firearm by a convicted felon.  The warrant was determined to be overbroad because it allowed the seizure of any electronic device in the defendant's home, regardless of the device's ownership.  867 F.3d at 1268, 1276.  Here, by contrast, the alleged crime itself was linked only to the home, and not yet to a specific person living there.

it is conducted, the justification for initiating it, and the place in which it is conducted.'" *United States v. Cofield*, 391 F.3d 334, 336 (1st Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

Again, in undertaking this exercise, I do not write on a blank slate. While Justice Billings found that the officers' interrogation became custodial when Armstrong threatened to tear the house apart, warranting the suppression of all of Merrill's statements from that point until he was read his *Miranda* rights, he separately concluded that "[t]he search conducted was within the scope of the warrant and the manner in which it was conducted was reasonable." ECF No. 25-3 at 1-2.

Bosco and Armstrong arrived during daylight hours, identified themselves as police officers, were invited into the home by Merrill's wife, and completed their search in a matter of hours. That Merrill's movements were restricted and that the officers at times took an aggressive and threatening tone did not render the manner of the search as a whole unreasonable. Taking the complaint's factual allegations as true, the search did not violate the Fourth Amendment, and even if it did, Bosco and Armstrong are entitled to qualified immunity.

### d.   Probable Cause for Arrest

Merrill further contends that he was arrested without probable cause in violation of his Fourth Amendment rights, stating that Bosco decided to arrest him "for reasons that are not understood." ECF No. 1 ¶ 72. He alleges that Bosco admitted during cross-examination during a subsequent hearing on a motion to suppress that the police typically do not arrest suspects in these types of cases when

there is no confession, and that Justice Billings "agree[d]" that there was "no reason to make an arrest in this case," *id.* ¶ 73, stating, in his order dismissing the case on speedy trial grounds, "If the perceived risk to the Defendant's children was an actual jeopardy, the State has other ways to seek protection for the children other than a bail order," ECF No. 25-4 at 4 n.1.[14]  Merrill asserts that, even after a three-hour interrogation during which *Miranda* violations were committed, officers remained "unclear as to who or what was responsible for the alleged contraband" and, thus, lacked probable cause to arrest him.  ECF No. 30 at 11.

Probable cause to arrest "exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission." *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018) (internal quotation marks omitted). "Probable cause must be assessed on the basis of the totality of the circumstances." *Id.*  "Probable cause is not a high bar," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (citations and internal quotation marks omitted).  The test of whether probable cause exists is an objective one: "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for

---

[14] I have corrected the plaintiff's misquotation of Justice Billings's speedy trial order.

the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* (internal quotation marks omitted).

As the Defendants correctly point out, Justice Billings did not agree that there was no probable cause to arrest Merrill.  Rather, he dismissed the case for speedy trial violations, observing:

> If the State is going to choose to make an arrest and bring charges, they need to have the resources to prosecute such cases in a timely fashion. The State could have chosen to delay this prosecution until after the forensic evaluation was completed, as is often done in these cases.

ECF No. 25-4 at 4.  The sentence highlighted by Merrill appears in a footnote to the second sentence: "If the perceived risk to the Defendant's children was an actual jeopardy, the State has other ways to seek protection for the children other than a bail order." *Id.* at 4 n.1.  In context, this remark bore on the timing of the arrest and prosecution, not on a lack of probable cause to arrest Merrill.  Additionally, although the Defendants argue that "the fact that an IP address registered to [Merrill] at [Merrill's] home was identified as sharing files known to contain child pornography is itself sufficient to support an arrest for possession of child pornography," they do not cite to any authority in support of that proposition.   ECF No. 25 at 24. Nevertheless, for the reasons that follow, I conclude that probable cause to arrest Merrill was at least arguable based on his own version of events.

Accepting, as I must, the well-pleaded facts of the Complaint and drawing all reasonable inferences therefrom, Bosco did not have any more information at the conclusion of his interrogation that Merrill had committed any child pornography crimes than he had at its inception.  To the contrary, he possessed additional

information that Merrill was not the only resident of the home or the only person who potentially had access to the computer suspected of downloading child pornography. Yet, on similar facts, the United States Court of Appeals for the Sixth Circuit recently concluded that there was probable cause to arrest a suspect for the promotion of the sexual performance of a minor based on evidence that an unlawful video had been uploaded through his router. *See Jones v. Clark Cty.*, 959 F.3d 748, 757 (6th Cir. 2020).

In *Jones*, as here, officers had secured a search warrant and, at the point of arrest, knew that the suspect "owned the router associated with the illegal download." *Id.* They learned only later that the suspect "was alone the night of the download, [and] that his router was password-protected." *Id.* Nonetheless, the court held, "[t]he fact that [the suspect] owned the router that [police] records indicated was used to upload child pornography and that the router was located in [the suspect's] apartment could warrant a prudent man in believing that [the suspect] had committed or was committing an offense." *Id.* at 758 (internal quotation marks omitted). The court elaborated: "Notwithstanding that the charges against [the suspect] were eventually dismissed, it is reasonable to think that because an individual owns a router that was indisputably used to upload child pornography, that individual may have been the one to have uploaded the unlawful material." *Id.*

Similarly, in this case, when Bosco arrested Merrill, he knew that a computer using an IP address assigned to Merrill had at least partially downloaded child pornography. Although in this case another adult was in the home at the time of the

search, a probable cause determination "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975); *cf. Maryland v. Pringle*, 540 U.S. 366, 372 (2003) ("We think it an entirely reasonable inference . . . that any or all three of the occupants [of a vehicle] had knowledge of, and exercised dominion and control over, the cocaine [found in the vehicle].  Thus, a reasonable officer could conclude that there was probable cause to believe [one of the three occupants] committed the crime of possession of cocaine, either solely or jointly.").  Additionally, the TWC subscription that was assigned the IP address at the relevant time was in Merrill's name, not his wife's.

Moreover, I need not decide whether Bosco definitively had probable cause to arrest Merrill.  The Supreme Court has held that courts have discretion to bypass the first prong of the qualified immunity analysis (whether there has been an underlying constitutional violation) and skip to the clearly-established prong, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and I exercise that discretion here.  Merrill does not identify "either controlling authority or a consensus of cases of pervasive authority sufficient to signal to a reasonable" officer in Bosco's shoes that his conduct "would violate a constitutional right." *Rodrigues*, 955 F.3d at 184 (internal quotation marks omitted).

Accordingly, Bosco is entitled to qualified immunity with respect to the claim that he arrested Merrill without probable cause.

### e.    Malicious Prosecution

Merrill also makes a claim of malicious prosecution predicated on the alleged failure of Moran and Langford to provide certain allegedly exculpatory evidence to the prosecutor, as well as Lang's alleged misstatements regarding MCCU's use of honeypotting (that is, the fake sharing or holding out of illicit files in order to lure people seeking child pornography) and the public availability of the files observed being downloaded at Merrill's IP address.

To establish a claim of "malicious prosecution in violation of the Fourth Amendment," a plaintiff must show that the defendant "(1) caused (2) a seizure of [the plaintiff] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [the plaintiff's] favor." *Hernandez-Cuevas v. Taylor*, 836 F.3d 116, 124 (1st Cir. 2016) (internal quotation marks omitted). To establish causation, a plaintiff must "demonstrate that law enforcement officers were responsible for his continued, unreasonable pretrial detention." *Id*. at 125 (internal quotation marks omitted). "Such responsibility may be established by showing that the officers made, influenced, or participated in the decision to prosecute by, for example, (1) lying to or misleading the prosecutors; (2) failing to disclose exculpatory evidence; or (3) unduly pressuring the prosecutor to seek the indictment." *Id*. (citations, alterations, and internal quotation marks omitted).

Merrill argues that Langford and Moran failed to give the prosecutor "accurate information that was clearly exculpatory, and most certainly influenced his decision to continue the prosecution." ECF No. 1 ¶ 89. But Merrill does not explain how or

32

why any of the information about the hidden folder or malware was material to the continued prosecution, or why Langford's and Moran's alleged failure to disclose it caused the prosecution to continue. To the contrary, the Complaint indicates that the prosecution continued even after the prosecutor became aware of the results of Birney's forensic analysis, until it was dismissed on speedy-trial grounds. Similarly, the complaint does not sufficiently allege that Lang's affidavit or testimony impermissibly contributed to Merrill's prosecution. Justice Billings appears to have been aware of Birney's disagreements with Lang's characterizations, and Merrill does not explain why or how that court was misled.

Moreover, there is good reason to be skeptical that these statements would be material to the prosecution. First, regarding Langford's report, as the Defendants point out, "a hidden directory is in no way unusual in a child pornography case." ECF No. 25 at 26. And the fact that the files were not accessed or viewed would not preclude prosecution for a crime of possession. *See* 17-A M.R.S.A. §§ 283-284.

Second, contrary to Merrill's implication, Moran's reports that the computer contained "trojans" but that there was "no evidence of malware that would have allowed unauthorized remote access," ECF No. 1 ¶ 85, are not internally inconsistent. After all, the obvious alternative explanation is that Moran discovered trojan horse viruses that would not have allowed unauthorized remote access. Merrill points to Birney's determination that the computer had at least one Remote Access Trojan, but does not suggest that there is only one acceptable method of forensic computer-security analysis; indeed, this seems like a quintessential dispute between expert

opinions.  In short, even if Birney would have prevailed in an eventual battle of the experts, Merrill does not explain how or why Moran knew or should have known that his own analysis was wrong.

Finally, Merrill does not explain, and it is difficult to see, why Lang's statements about the MCCU's use of honeypotting and the public availability of the files observed via RoundUp—even assuming that those statements were inaccurate— would have had any bearing on the prosecution.  Regarding honeypotting, Merrill does not contest the essential historical facts underlying probable cause: that an IP address associated with his name and address was observed to have partially downloaded files with hash values of known child pornography files, albeit in incomplete and unviewable chunks.  Whether those download requests were for "real" contraband or for honeypot files would not have changed these basic facts.  As for the "public availab[ility]" of the files, Birney's analysis of Lang's statement suggests that his point of disagreement with Lang was about Lang's use of the term "available." But Merrill's prosecution was not predicated on his having shared illegal files; instead, the prosecution was focused on his alleged downloading and possession of the files.  Birney's analysis does not contradict the material fact in Lang's statement: that the files—or, to be precise, unviewable chunks of them—were observed being downloaded at Merrill's IP address.

Accordingly, Merrill fails to state a claim against Langford or Moran for malicious prosecution.[15]

---

[15]  In the alternative, Langford, Moran, and Lang are entitled to qualified immunity on this claim. Again, while the Defendants raised this issue in their motion, Merrill addressed it only in passing in

### 2.  Fifth Amendment Claim

Merrill alleges that Bosco and Armstrong violated his Fifth Amendment due process rights, a claim that he ties to the *Miranda* violations found by Justice Billings.

"The basic due process constraint, where substance and not procedure is involved, is against behavior so extreme as to shock the conscience." *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999) (internal quotation marks omitted). "Outside of a few narrow categories, like the safeguarding of prisoners who have been wholly disabled from self-protection, this means conduct that is truly outrageous, uncivilized, and intolerable." *Id.*

The allegations in Merrill's Complaint do not suffice to demonstrate behavior so extreme as to shock the conscience.  Bosco and Armstrong were invited into Merrill's home by his wife during the daytime and remained for two-and-a-half to three hours.  Merrill does not allege that Bosco or Armstrong prevented him from contacting an attorney when he inquired whether he needed one.  The fact that Merrill's movement was sufficiently restricted, and the officers' tone sufficiently threatening, to amount to a custodial interrogation in the absence of *Miranda* warnings does not demonstrate behavior so extreme as to shock the conscience.  And, for reasons I have already explained, Justice Billings's order suppressing certain statements does not supply the predicate for such a finding.  Finally, Merrill's allegation that Bosco was found in two prior cases to have violated other defendants'

---

his response, and cited no caselaw in support of his argument.  He therefore has failed to carry his burden to identify sufficient authority "to signal to a reasonable" officer in these Defendants' shoes that his or her conduct "would violate a constitutional right." *Rodrigues*, 955 F.3d at 184.

*Miranda* rights is concerning, but does not render his conduct on the day in question—as described by the complaint—so extreme as to shock the conscience. Thus, Merrill's complaint does not state a claim of a Fifth Amendment violation.

### 3.    Eighth Amendment Claim

Merrill next alleges that the Defendants violated his Eighth Amendment right "to be free from 'cruel and unusual punishments.'"  ECF No. 1 ¶ 110.  He argues that "[t]he reality is enduring a five[-]year prosecution with court ordered isolation from your own children, loss of employment, and limited access to public places is 'cruel and unusual' for a citizen who had no prior convictions or arrests."  ECF No. 30 at 3. However, the Eighth Amendment pertains to punishments inflicted following a person's conviction of a crime.  *See, e.g., Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991) (noting that the Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."); *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt.").   Because Merrill does not allege that he was convicted of a crime, he fails to state a claim of cruel and unusual punishment in violation of his Eighth Amendment rights.  Thus, the Defendants are entitled to the dismissal of the Eighth Amendment claim.

### 4.    Fourteenth Amendment Claim

Merrill generally alleges that the defendants violated his "procedural and substantive due process rights" under the Fourteenth Amendment.  ECF No. 1 ¶ 110.

The Defendants construe this claim to implicate *Brady v. Maryland*, 373 U.S. 83 (1963), a fair characterization that Merrill does not dispute.[16]

To state such a claim, a plaintiff must allege, *inter alia*, that he or she was convicted of a crime. *See, e.g.*, *Drumgold v. Callahan*, 707 F.3d 28, 48 (1st Cir. 2013) ("To recover damages under § 1983, Drumgold must show more than a *Brady* violation. He also must demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his conviction.") (citations omitted). Merrill makes no such allegation. His complaint therefore fails to state a Fourteenth Amendment claim, entitling the Defendants to the dismissal of this claim.

## B.   Counts Two and Three: Supervisory Liability

As with Merrill's § 1983 claims in Count One, the MSP, the MCCU, and Williams and Lang in their official capacities are entitled to dismissal of Counts Two and Three against them. They are not "persons" who may be sued pursuant to § 1983. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Nieves-Márquez*, 353 F.3d at 124. Williams and Lang, in their personal capacities, also seek

---

[16] While the Fourteenth Amendment *Brady* claim and the Fourth Amendment malicious prosecution claim both implicate Langford's and Moran's alleged failure to disclose evidence to the prosecutor, the two claims are distinct. *See Solomon v. Dookhan,* No. 13-10208-GAO, 2014 WL 317202, at *7 (D. Mass. Jan. 27, 2014) ("Even where *Brady* is not implicated, state actors nevertheless violate an accused's due process rights when they engage in a deliberate deception.") (internal quotation marks omitted).

to dismiss the supervisory liability claims on the basis that Merrill's complaint fails to allege sufficient personal involvement.  I agree.

"Supervisory personnel are liable under § 1983, upon a showing of a constitutional violation, when: (1) the supervisor's conduct or inaction amounts to either deliberate, reckless or callous indifference to the constitutional rights of others, and (2) an affirmative link exists between the street-level constitutional violation and the acts or omissions of the supervisory officials."  *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1231 (D. Me. 1996).  "An important factor in making the determination of liability is whether the official was put on some kind of notice of the alleged violations, for one cannot make a 'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that requires the taking of affirmative steps."  *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 902 (1st Cir. 1988) (citation omitted).  "The showing of causation must be a strong one, as that requirement contemplates proof that the supervisor's conduct led *inexorably* to the constitutional violation."  *Ramírez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19-20 (1st Cir. 2014) (internal quotation marks omitted).

Merrill argues that his complaint demonstrates how and why Williams and Lang were directly involved: (1) they were the Commanding Officers (COs) of the MSP and the MCCU, respectively; (2) their decisions to hire and train personnel, follow correct law enforcement protocols/standards, and undertake criminal investigations, which led to the alleged constitutional harms on which the complaint is based, begin and end with them and took place under their watch; and (3) if they

were not sufficiently involved, there is negligence and improper supervision with respect to adherence to MSP/MCCU standards, federally funded ICAC Task Force requirements (e.g., proper training and investigation protocols), and general law enforcement requirements with respect to the constitutional rights of citizens. Merrill points out that a significant part of his complaint "is rooted in violations of constitutional rights, due to egregious negligence, non-adherence to ICAC standards, poor judg[]ment, false and perjured affidavits/testimony, [and] improper training of subordinate police officers under their command," for which he contends Williams and Lang are personally and professionally liable.  ECF No. 30 at 10.

At the end of the day, however, the law requires Merrill to demonstrate an affirmative link between the supervisory defendants and the alleged constitutional violations.   Merrill's complaint does not succeed: "These are exactly the sort of 'unadorned, the-defendant-unlawfully-harmed-me accusations' that both [the First Circuit] and the Supreme Court have found insufficient" to state a claim of supervisory liability for purposes of section 1983.  *Feliciano-Hernández v. Pereira-Castillo,* 663 F.3d 527, 534 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678 (alteration omitted)); *see also, e.g., Johnson v. City of Biddeford*, 2:17-cv-00264-JDL, 2018 WL 1173428, at *4 (D. Me. Mar. 6, 2018) ("[The plaintiff's] allegations ask the Court to infer [supervisory] liability from a conclusory allegation of a violated policy, and are thus insufficient to state a claim pursuant to § 1983.").

Williams and Lang, accordingly, are entitled to the dismissal of Counts Two and Three against them.

## C.   State-Law Claims

The Defendants next contend that Merrill's state-law claims for false arrest and malicious prosecution (Count Four), defamation (Count Five), IIED (Count Six), and NIED (Count Seven)—which he brings against all the Defendants—must be dismissed because he failed to serve the notice of claim required by the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. §§ 8101-8118 (West 2020), therefore depriving the Court of subject-matter jurisdiction to adjudicate those claims.   The Defendants are correct.

When tort claims are asserted against Maine governmental entities and employees, the MTCA requires that the claimant substantially comply with certain "notice requirements" before bringing a civil action in court.   14 M.R.S.A. § 8107(1), (4); *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 430 (Me. 1987) (noting that the MTCA's notice requirements pertain to suits against both government entities and employees).   The MTCA provides, in relevant part:

> Within 180 days after any claim or cause of action permitted by this chapter accrues, or at a later time within the limits of section 8110, when a claimant shows good cause why notice could not have reasonably been filed within the 180-day limit, a claimant or a claimant's personal representative or attorney shall file a written notice containing:
>
> A.   The name and address of the claimant, and the name and address of the claimant's attorney or other representative, if any;
>
> B.   A concise statement of the basis of the claim, including the date, time, place and circumstances of the act, omission or occurrence complained of;
>
> C.   The name and address of any governmental employee involved, if known;

D.  A concise statement of the nature and extent of the injury claimed to have been suffered; and

E.  A statement of the amount of monetary damages claimed.

14 M.R.S.A. § 8107(1) (Westlaw through Sept. 18, 2019).[17]  Absent compliance with the MTCA's notice of claim provisions, this Court lacks jurisdiction to entertain Merrill's tort claims against any of the Defendants.  *See, e.g., Cataldo v. U.S. Dep't of Justice*, No. 99-264-B-C, 2000 WL 760960, at *4 (D. Me. May 15, 2000).

The last of Merrill's claims accrued in April 2018, when the criminal charges against him were dismissed on speedy trial grounds.  *See Heck v. Humphrey*, 512 U.S. 477, 489 (1994) ("[A] cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor.").  Therefore, he had until October 2018 to file a notice of claim.  Merrill neither alleges in his complaint that he complied with this requirement nor contests the Defendants' assertion that he did not.  Indeed, Oliver, a custodian of all notices of tort claims filed with the Maine Office of the Attorney General, found no record of a notice of claim filed by Merrill during the period from the beginning of 2014 through January 17, 2020.

Merrill argues, however, that because the "[t]he common law tort claims emerge from the same operative facts as the Section 1983 claims," allowing this Court to exercise supplemental jurisdiction over them, and "the Law Court has interpreted the MTCA notice and limitations requirements as not applying to a Section 1983

---

[17]  The MTCA's 180-day limit has recently been extended to allow a claimant 365 days within which to file the required notice, but the amendment is applicable only to causes of action accruing on or after January 1, 2020.  *See* P.L. 2019, ch. 214, § 1 (effective Sept. 19, 2019).  Because Merrill's claims accrued before then, the amendment is not relevant to this case.

claim," the MTCA requirements likewise should not "apply to the common law tort claims arising out of the same nucleus of operative facts." ECF No. 30 at 2 (citing *Mueller v. Penobscot Valley Hosp.,* 538 A.2d 294 (Me. 1988)).

As the Defendants rejoin, *Mueller* does not salvage Merrill's tort claims. On the contrary, the Law Court has held that summary judgment should enter in favor of defendants on a plaintiff's tort claims where the plaintiff has failed to comply with the notice of claim requirement of 14 M.R.S.A. § 8107. *See Mueller*, 538 A.2d at 297.

Because this Court lacks jurisdiction to adjudicate Counts Four through Seven, those claims are dismissed pursuant to Rule 12(b)(1).

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Defendants' Motion to Dismiss Complaint (ECF No. 25) is **GRANTED** and the complaint (ECF No. 1) is **DISMISSED**.


**SO ORDERED.**

Dated: November 25, 2020


_____
        **/s/ Jon D. Levy**
**CHIEF U.S. DISTRICT JUDGE**